DECISION AND JUDGMENT
{¶ 1} This case is before the court on appeal from the judgment of the Lucas County Court of Common Pleas which, following a jury trial, found appellant, Mychal Keahey, guilty in Counts 1, 2, and 3, of felonious assault, in violation of R.C. 2903.11(A)(2), each being a felony of the second degree, in Count 4, guilty of improperly discharging a firearm at or into a habitation, in violation of R.C. 2923.161(A)(1), a felony *Page 2 
of the second degree, and guilty of a specification, attached to each conviction, of displaying, brandishing or possession of or using the firearm, in violation of R.C. 2941.145. Appellant was sentenced on December 27, 2006, [1] to a term of seven years each as to Counts 1, 2, 3 and 4. Counts 1 and 2 were ordered to be served consecutive to one another, and Counts 3 and 4 were ordered to be served concurrently with one another, and concurrently with Count 1. Appellant was sentenced to an additional mandatory consecutive term, pursuant to R.C. 2929.14(D)(1), of three years as to each firearm specification, which were ordered to be served concurrently with one another and prior to and consecutive to Counts 1 through 4. In total, appellant was ordered to serve a total of 17 years in prison.
 {¶ 2} Appellant timely appealed his convictions and raises the following assignments of error on appeal:
 {¶ 3} "I. Defendant's conviction is against the manifest weight of the evidence.
 {¶ 4} "II. Appellant was denied his right to effective assistance of counsel as the acts and omissions of trial counsel deprived him of hisSixth Amendment right to effective assistance of counsel in violation of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution.
 {¶ 5} "III. Appellant was improperly convicted of the gun specification as it relates to count four (4) of the indictment." *Page 3 
 {¶ 6} This matter arose out of an incident that occurred on September 23, 2006, at the home of Jackie Maddox, located at 525 East Weber, Toledo ("the property"), where appellant allegedly shot Tamara Mills in the thigh, grazed Myshiona Agnes' shin with a bullet, and shot at Myron Agnes. Maddox, several children, and two of her daughters, including Tamara Mills, lived at the property. Shantille Mills, who is also Maddox's daughter, did not live at the property. Shantille and Myron had four children together, Myshiona Agnes, Myshaun Mills, Marwana Agnes, and Marquill Agnes. At the time of the incident, Shantille was married to appellant. Appellant and Shantille also had a child together, who was three months old at the time of the incident. On the day of the incident, Maddox was hosting a birthday party for her grandson, Myshaun.
 {¶ 7} According to Myron, on September 23, 2006, he was at Maddox's house for Myshaun's birthday party. Myron was sitting on the front porch when appellant arrived with another man at the property, in either a Cutlass or a Regal, and entered the house. Myron remained on the porch, appellant entered the house, and the other man stayed in the car. Myron testified that appellant exited the house and "swung" at Myron three times. He and appellant were in the front yard ready to fight when the man appellant brought exited the vehicle. The occupants from the house also came outside and were attempting to break up the fight. Myron stated that appellant eventually got back into the car he arrived in and drove off. Shantille was at the store during this encounter.
 {¶ 8} According to Myron, approximately four minutes later, appellant returned to the property in another vehicle, which Myron described as a burgundy Chevy or *Page 4 
Perisian. Appellant was alone when he returned. Myron testified that he was standing on the sidewalk in front of the property when the burgundy vehicle stopped in the middle of the street. A number of adults and children were still in the yard. Shantille, however, was still not present. Appellant exited the vehicle and "stood there for a second." Myron also stood where he was on the sidewalk, until he realized that appellant had a chrome pistol in his hand, then he ran inside the house. Once inside, Myron heard yelling to the effect that Tamara was shot. Myron also found his daughter, Myshiona, in Maddox's bedroom, "crying because she had got hit, she had got grazed."
 {¶ 9} Tamara Mills testified that she lived with her mother, Jackie Maddox, her sister, Tracy Russell, and brothers, Terry and Marqwan Russell. Tamara was home on September 23, 2006, for her nephew's birthday party. She was inside the home when appellant came in and told her that there was a man she knew from school, named Neal, out in the car. Appellant then left, but Tamara stayed inside. Tamara then heard that appellant was trying to start a fight with Myron and went outside to stop it. She and others attempted to break up the fight and then Myron spit in appellant's face. Tamara testified that appellant eventually left and she and others started gathering the children back in the house. Tamara saw appellant a second time when he drove up in a maroon Chevy, got out of the car, and reached for his pants. Tamara testified that she immediately began to run, yelling at the children to get in the house because appellant had a gun. She heard a popping sound and managed to get into the house, diving to the floor. Once inside the house, Tamara noticed that she had been hit in the left thigh. She *Page 5 
began yelling out to determine if all the children were safe, and heard her niece, Myshiona, screaming because she was grazed with a bullet.
 {¶ 10} On cross-examination, Tamara testified that the other adults present were Tamisha Gills, Nicole Sanders, Michelle Mills and Jackie Maddox. Tamara testified that, less than five minutes after appellant left, she was standing on the porch and appellant returned, alone, in a four door maroon Chevy. Tamara testified that she was familiar with the vehicle, and that it was titled in appellant's friend's name. Appellant was in the same clothing he had been wearing previously. The people standing outside yelled that he had a gun and started to run. Some ran into Maddox's house and others ran to the neighbor's house. Tamara testified that she did not notice Myron's whereabouts when appellant arrived on the scene a second time because she was concerned about the children who were present. Tamara saw appellant reach for the gun, but did not see it in his hand. Tamara, however, was still on the porch when she heard the first shot. Tamara could not specify the number of gunshots she heard, but believed it was more than two shots.
 {¶ 11} Cheryl Mills testified that she was in Maddox's dining room when appellant came in and told Tamara that a friend of his was outside in the car wanting to see her. Appellant then left and, according to Cheryl, a family friend came in and said that appellant and Myron were going to fight. Cheryl testified that she went outside with Shantille's and appellant's baby and tried to break up the fight. Appellant left and later returned to the property in a maroon Chevy. Cheryl described the incident as follows: *Page 6 
 {¶ 12} "[Appellant] pulled up. He jumped out the car, and one of the little girls, she was on her way out to the street to go to her mother's car to get something out. [Appellant] jumped out and he had a gun, and I was like, I yelled it and told everybody that he had a gun because we had the kids sitting on the porch and they was all running in, and before I know it, he started shooting up in the air. I wasn't aware that two of the bullets went inside because that's where my niece, Myshiona and Tamara, they was in the house running in, and I was standing there pushing my son down and I seen the two bullets go up in the air and that was all, but there were more shots going off but I was just nervous because there was just shots."
 {¶ 13} Cheryl recalled four to six shots being fired. She also stated that she was standing close to appellant and that the gun was silver with a brown handle. Cheryl and her son knelt down by a truck in the driveway. Cheryl testified that after firing shots, appellant looked at her and her son "in the face" and that she "was scared because we got locked outside the house." It was not until after the shooting that she found out that gunshots had gone inside the house and hit people. After the shooting, Cheryl walked around the corner to appellant's mother's house to look for Shantille, who was delivering to Vivian, appellant's mother, some birthday cake. Cheryl found Shantille at Vivian's house and told her about Tamara and Myshiona getting shot by appellant.
 {¶ 14} On cross-examination, Cheryl described the initial incident between appellant and Myron. Cheryl testified that she did not see appellant hit Myron, but saw appellant exit the porch, followed by Myron, into the front yard. The two were squaring *Page 7 
up to fight, but she stepped between them to break it up. Appellant was calling Myron names, indicating that he should not be present at Maddox's house. Myron responded that he was there for his son's birthday party. Cheryl told appellant to leave because he was being violent, and that Myron had a right to be there. Cheryl confirmed that Myron spit in appellant's face. Cheryl testified that she continued counseling appellant about not fighting while he was getting into the car.
 {¶ 15} Sergeant Greg Smith, Toledo Police Department, testified that he went to St. Vincent's hospital to interview the victims. He observed the gunshot wound to Tamara's left thigh, and a "grazing gunshot wound" to Myshiona's left shin. Smith testified that Myshiona stated that she saw appellant with a gun, heard her aunts yell to "get down" because he had a gun, heard one or two shots, and felt a "really bad" sting that hurt.
 {¶ 16} Vivian Keahey, appellant's mother and Shantille's mother-in-law, testified that Shantille dropped off an ice cream cake for appellant around the time the police arrived, following the shooting. Keahey also testified that appellant had been at her home for most of the day and that he normally drives a burgundy Cutlass. She further testified that a burgundy car, not the Cutlass, was towed from the alley behind her house, but that she did not see appellant driving that car on September 23, 2006. On cross-examination, Keahey testified that there were approximately ten people in her back yard, having a barbeque, at the time appellant left her house. *Page 8 
 {¶ 17} Myshiona testified that she was at her grandmother's house on the day of the incident. She came outside when appellant, her step-father, and Myron, her father, were arguing. Myshiona testified that her Aunt Cheryl stood between them to calm them down. Myshiona took her infant brother from Cheryl and returned to the house. Thereafter, Myron walked away and appellant drove off. According to Myshiona, she was standing in the doorway of the house when appellant returned, driving himself in a burgundy two door. Myshiona recalled that Myron was on the sidewalk, talking on his cell phone. Myshiona testified that appellant stepped out of the car, looked at everybody, and started shooting. She ducked down, jumped on her Aunt Tamara, who was standing next to her in the doorway, and felt her shin get grazed by a bullet. Myshiona testified on cross-examination that Cheryl, Cheryl's son Bobbie, and Myron were outside when appellant returned. Myshiona did not see appellant holding the gun, but heard four shots fired. After being hit, Myshiona testified that she crawled into her grandmother's room.
 {¶ 18} Officer Thomas Corser, Toledo Police Department, testified that he found a car matching the description of the suspect's vehicle parked in the alley behind Vivian Keahey's house, against the privacy fence. Corser described the vehicle as a 1986 Chevy Caprice, maroon, four door. The car was towed away by the police.
 {¶ 19} Detective William Rodgers, Toledo Police Department, testified that the only bullet recovered was in Tamara's thigh, and that no shell casings were recovered. Rodgers testified that it was possible that Myshiona was grazed with the same bullet that struck Tamara. No scientific tests were conducted on the bullet recovered, or the *Page 9 
impounded vehicle. Rodgers also testified that Vivian never provided the police with any names of individuals who were with appellant on the day of the shooting.
 {¶ 20} Brian Warner, who was married to appellant's sister, was called on behalf of the defense. Warner testified that around 6:15 or 6:20 p.m., on September 23, 2006, he was driving past Maddox's house, but did not stop. Warner testified that a vehicle pulled up in front of the property, a black gentleman got out of the vehicle on the passenger side, fired one shot, and got back into the vehicle. Warner could not identify the car, but knew that a second person was driving. Warner also testified that Myron was the person at whom the gunman was firing. Warner stated that the car sped off and that he then backed up his vehicle, turned around, and went home. Warner never contacted the police regarding what he witnessed.
 {¶ 21} After waiving his Fifth Amendment rights, appellant testified in his own behalf. Appellant testified that he owns a 1987 two door maroon Monte Carlo. On September 23, 2006, he was with his friend Neal Summers, who owns a two door blue Cutlass. Prior to going to his stepson's birthday party at Maddox's house, Neal and appellant were at appellant's mother's house, along with a number of other people who were in the backyard eating and shooting dice. When appellant arrived at the property, he went inside to the dining room. Neal stayed in the blue Cutlass. Appellant saw Myron sitting in a chair on the front porch next to the door as appellant entered the house. After speaking with "Mira" inside the house, appellant walked out the front door. According to appellant, Myron jumped up and asked appellant why he was there. *Page 10 
Appellant threw a couple of punches at Myron and then the two of them were in the yard, swinging at each other. People in the house came outside to break them up. Appellant testified that they never actually hit one another, but that Myron spit in appellant's face. Eventually, Cheryl and some of the children were crowding him, so appellant got back into Neal's car. After the crowd cleared away from the car, appellant left with Neal, went to a gas station and then to Neal's house. Appellant testified that he never returned to his mother's house that evening.
 {¶ 22} The defense rested and the case was continued until the following morning, December 13, 2006, for closing arguments and jury deliberations. The following morning, juror number two failed to appear and the court was unable to reach her. The trial court determined that it would proceed with separate contempt proceedings against the missing juror, and placed the alternate juror in her place for the conclusion of appellant's trial. After closing arguments, instructions, and deliberations, the jury found appellant guilty as charged.
 {¶ 23} In his first assignment of error, appellant argues that his convictions were against the manifest weight of the evidence. Specifically, appellant argues that, as to Count 2, there was no evidence presented that Myshiona was actually shot by any gun or that any bullet grazed her, or that a gun was even fired in her direction. Appellant suggests that Myshiona's injury could have occurred when she was jumping down onto her Aunt Tamara. Appellant additionally argues that there was no evidence that he intended to cause or attempt to cause physical harm to Myshiona. With respect to Count *Page 11 
4, appellant argues that there was no evidence presented that appellant actually fired a gun at or into a habitation; rather, appellant asserts that only Cheryl Mills allegedly saw appellant actually fire a gun, but that was into the air. Appellant argues that no bullets were found anywhere in the house, and that Tamara testified that when the shooting started, she was outside of the residence. As to Count 3, appellant argues that there was no evidence that appellant attempted to shoot at Myron. Myron was never injured, and there was no evidence that appellant ever aimed a weapon at Myron.
 {¶ 24} Crim. R. 29(A) states that a court shall order an entry of judgment of acquittal if the evidence is insufficient to sustain a conviction of the offenses. As such, the issue to be determined with respect to a motion for acquittal is whether there was sufficient evidence to support the conviction. Sufficiency of the evidence and manifest weight of the evidence are quantitatively and qualitatively different legal concepts. State v. Thompkins (1997), 78 Ohio St.3d 380,386.
 {¶ 25} "Sufficiency" applies to a question of law as to whether the evidence is legally adequate to support a jury verdict as to all elements of a crime. Id. In making this determination, an appellate court must determine whether, "after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus.
 {¶ 26} When considering whether a judgment is against the manifest weight of the evidence in a bench trial, an appellate court will not reverse a conviction where the trial *Page 12 
court could reasonably conclude from substantial evidence that the state has proved the offense beyond a reasonable doubt. State v. Eskridge
(1988), 38 Ohio St.3d 56, 59. The court reviews the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether, in resolving conflicts in the evidence, the court "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." Thompkins at 387, quoting State v. Martin (1983),20 Ohio App.3d 172, 175. The discretionary power to grant a new trial should be exercised only in exceptional cases where the evidence weighs heavily against the conviction. Id.
 {¶ 27} In order to be found guilty of felonious assault, in violation of R.C. 2903.11(A)(2), the state had to prove beyond a reasonable doubt that appellant caused or attempted to cause physical harm to another by means of a deadly weapon or dangerous ordnance. To be found guilty of improperly discharging firearm at or into habitation, in violation of R.C. 2923.161(A)(1), the state had to prove beyond a reasonable doubt that appellant discharge a firearm at or into an occupied structure that is a permanent or temporary habitation of any individual.
 {¶ 28} Upon a thorough review of the record, we find that the evidence presented establishes the offenses of felonious assault, as to Myshiona and Myron, and improper discharge of a firearm into a habitation. Although Cheryl only saw appellant fire a gun into the air, Myshiona testified that she was in the doorway of the residence, next to Tamara, when appellant arrived and began to shoot. The fact that Tamara was shot in the *Page 13 
thigh, while she was on the porch and/or running into the house through the front door, establishes that appellant shot into the habitation. Additionally, Myshiona and Sergeant Smith testified that Myshiona suffered a grazing wound to her shin. Myshiona's testimony established that her wound occurred while she heard shots being fired and while she was diving down onto Tamara. There was no evidence suggesting any other cause, other than a gunshot wound, for Myshiona's injury. Finally, Myron testified that he was outside when appellant arrived a second time and that he ran into the house while shots were being fired. Based on the fact that, immediately prior to the shooting, Myron had spit in appellant's face, that Myron ran into the residence, and appellant shot into the residence, we find that the state proved beyond a reasonable doubt that appellant was attempting to cause serious physical harm to Myron with a deadly weapon. It is not necessary that appellant actually hit his target to be found guilty of felonious assault. Accordingly, we find appellant's first assignment of error not well-taken.
 {¶ 29} Appellant argues in his second assignment of error that he was denied his right to the effective assistance of trial counsel based upon the following: counsel made no motion for acquittal pursuant to Crim. R. 29; counsel failed to propose an alternative jury instruction on aggravated assault as to Count 3; and that counsel should not have presented Warner as a defense witness.
 {¶ 30} In Ohio, a properly licensed attorney is presumed competent and the burden is on the appellant to show counsel's ineffectiveness.State v. Lytle (1976), 48 Ohio St.2d 391; State v. Hamblin (1988),37 Ohio St.3d 153. The United States Supreme Court, in *Page 14 Strickland v. Washington (1984), 466 U.S. 668, 686, set forth a two-part test for reviewing claims of ineffectiveness:
 {¶ 31} "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the `counsel' guaranteed by theSixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."
 {¶ 32} The United States Supreme Court held that "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial court cannot be relied on as having produced a just result." Id. Specifically, to establish ineffectiveness, appellant must show that, but for counsel's deficient performance, there is a reasonable probability the result of the trial would have been different. Id.
 {¶ 33} Based upon our ruling that appellant's conviction was proven beyond a reasonable doubt in appellant's first assignment of error, we find that trial counsel's representation was not deficient for failing to move for acquittal pursuant to Crim. R. 29. We also find that defense counsel's performance was not deficient for failing to request a jury instruction as to aggravated assault. Pursuant to R.C. 2903.12(A), only if appellant had been the shooter could he have established that he was "under the influence of sudden passion or in a sudden fit of rage, * * * brought on by serious provocation *Page 15 
occasioned by the victim that is reasonably sufficient to incite the person into using deadly force." Because appellant's testimony and sole defense was that he was not present during the shooting, defense counsel would have been remiss in requesting an aggravated assault jury instruction. Finally, we find that it was the defense's strategy to demonstrate that appellant was not present during the shooting. Warner's testimony was consistent with that defense approach. Therefore, we find that counsel's performance was not deficient in calling Warner as a witness to corroborate appellant's testimony. Appellant's second assignment of error is therefore found not well-taken.
 {¶ 34} Appellant argues in his third assignment of error that he was improperly convicted of the gun specification as it relates to Count 4, because the state failed to prove that he improperly discharged a firearm into a habitation. Based on our ruling with respect to appellant's first assignment of error, we find that the state did establish beyond a reasonable doubt that appellant was guilty of improper discharge of a firearm and, therefore, was also properly convicted of the gun specification with respect to Count 4. Appellant's third assignment of error is therefore found not well-taken.
 {¶ 35} On consideration whereof, this court finds that appellant was not prejudiced or prevented from having a fair trial and the judgment of the Lucas County Court of Common Pleas is affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App. R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Lucas County.
 JUDGMENT AFFIRMED. *Page 16 
A certified copy of this entry shall constitute the mandate pursuant to App. R. 27. See, also, 6th Dist. Loc. App. R. 4.
Peter M. Handwork, J., Mark L. Pietrykowski, P.J., Arlene Singer, J., CONCUR.
[1] Appellant's judgment entry of conviction and sentence was journalized on December 28, 2006. *Page 1